PLUMLEY *v.* STATE.

Opinion delivered December 14, 1914.

1. CRIMINAL LAW—EVIDENCE—RES GESTAE—HOMICIDE.—In a prosecution for homicide, exclamations of deceased made within ten or twenty seconds after he was shot are admissible in evidence as part of the *res gestae.* All that occurred at the time and place of the shooting, which has reference thereto, or connection therewith, is part of the *res gestae.*

2. HOMICIDE—SELF-DEFENSE.—In order to justify a homicide on the grounds of self-defense, it must appear that the circumstances were sufficient to excite the fears of a reasonably prudent person, and that the party killing really acted under this influence, and a bare fear that deceased will commit the act, to prevent which the homicide is committed, is not sufficient.

3. HOMICIDE—SELF-DEFENSE.—In a prosecution for homicide for the plea of self-defense to be availing, defendant must have acted so as to save his own life, and the deceased must have been the assailant, and it must appear that defendant endeavored to decline further combat before the mortal injury was given.

4. HOMICIDE—SELF-DEFENSE—RETREAT.—Defendant, in a prosecution for homicide, in order to establish a plea of self-defense, must show that he employed all the means in his power, consistent with his own safety, to retreat, and the plea is unavailing if he failed to do so.

5. HOMICIDE—SELF-DEFENSE.—In order to justify a plea of self-defense, it must have appeared to the defendant that his danger was imminent, and that, in order to save himself, the killing of deceased was necessary.

Appeal from Columbia Circuit Court; *C. W. Smith,* Judge; affirmed.

STATEMENT BY THE COURT.

A. J. Plumley was indicted for the crime of murder in the first degree in Columbia County for the killing of

his son-in-law, Bynum Martin, and upon trial was convicted of murder in the second degree, and from the judgment he appealed.

The facts are substantially: Bynum Martin was killed by being shot with a shotgun on the 3d day of October, 1913, in front of the house of Witt Perkinson in Columbia County, Arkansas. The killing occurred just about dark or shortly thereafter. Perkinson, who was at the supper table, heard a gun fire and a woman scream at his back porch. He ran immediately to her and then to the front porch, when he heard the dying man exclaim, "Oh! oh! Witt he shot me for nothing." He went to the place and found Bynum Martin lying on the ground wounded, who expired in five minutes thereafter. The feeling between the appellant and his son-in-law was not friendly and on the day of the killing and immediately before it, appellant called him up over the telephone and asked him why he had taken the flooring out of his cotton house, to which Martin replied, "I don't know that I have." Appellant said, "Yes, you have. I didn't give you the cotton house." Martin replied, "You have this wrong; come down here and we will talk it over." Appellant said, "No; I am not coming down there to your house, but I will meet you on half-way ground," to which Martin replied, "All right." This conversation was over a rural telephone line and J. H. Miller took down his receiver and heard it. He said the voices seemed dispassionate, and he was greatly shocked to hear of the death of Martin about a half-hour afterward. Appellant stated that Martin had moved the floor out of his cotton house, and he called him over the telephone and asked why he had done so, and "Martin replied that he did not know that he had moved the floor out of my cotton house," and I told him, "I did not give him the cotton house," and he said, "If you will come down here we will settle all that right now." I told him I did not care about coming down there, but would meet him on half-way ground, and he said he would do that, and I hung up the receiver. "I then picked up my gun and walked over to the bureau

drawer where I had two shotgun shells and put the shells in my gun. My wife asked me not to go down there, and I stood there and talked to her two or three minutes and told her I wouldn't meet Bynum myself, but would go to Witt Perkinson's and get him to go over to the half-way place and meet Bynum, and I started out, and just as I got to the place where the trail forked to go up to Perkinson's house, Bynum hailed me and said, "Is that you, Andrew Plumley?" and I said, "Yes," and he started toward me. I told him I was going up to Witt Perkinson's to get him to settle the matter and Bynum said, "No, sir," this is the time and here is the place where we will settle the matter," and I kept going and he started to head me off, saying all the time that he would not wait, that we would settle everything right there and then; he was within a few feet of me, about twelve, and said, "Here is the place where we will settle it," and at the time put his hand in his pocket and I thought I heard the click of a pistol. He was within ten or twelve feet of me. I raised my gun and fired, and he fell over there between me and the road. He was between ten and fifteen feet from me, between me and the road. I was standing in the trail that goes up from my house to Perkinson's, down toward my house from Martin's. My house was northwest of his, he was southeast of me. He was on the north side of the mound. We had not been on good terms prior to that night. He had mistreated my wife and also my daughter, who was his wife, to whom he had been married three years. I sold him the place he lived on and the house and little strip of land about thirty yards wide and two hundred fifty yards long, was not on the land I sold him, but I let him have the use of it, and he moved the floor from the house on this piece of land I had built for a shop. When I called him over the telephone he did not appear to be in a good humor. He was walking very fast when he came down toward me. Appellant told no one of having killed Martin until the Sunday following when he was asked about it.

Perkinson testified that he lived about two hundred yards from Plumley, the appellant. That the nearest way between the two houses was through his back yard; that the path from the front way was about fifty or seventy-five yards further than from the back. That Martin lived about a quarter of a mile from him; that going out from his front gate Plumley lived west and Martin to south. I heard the report of the gun that killed Bynum Martin. I was eating supper at the time and it was after dark, probably thirty minutes. There was. only one report. About that time a woman screamed at the back of my house. I heard the scream about the time I heard the report, and went to see about it, and Mrs. Plumley was at the back door; I then ran to the front and the man who was shot exclaimed, "Oh! oh!"—that, I don't suppose, was over ten seconds after the shot was fired; I couldn't understand him; I heard him say, "Oh! oh!," and "Witt, he shot me for nothing." I was about fifty yards from the wounded man, and he died about five minutes after he was shot. He was unconscious after I got to him; it might have been twenty seconds from the time I heard the gun fire until Martin made the statement; I had gotten to the front porch after the gun fired, and I started when I heard the scream out the back way; I suppose it is twenty-five or thirty feet from the back to the front of the house. I heard Martin's statement before I got off of the front porch. Martin was lying to the right of my front gate toward Plumley's house. The body was lying toward the cotton house. Mrs. Plumley went out to where the body was lying. Plumley was not there that night, although there was a crowd of thirty or forty present. A knife partly opened was found near Martin's body shortly after he was killed. The wound was in the left side. Nine buckshot entered the body with the exception of those striking the hand of the deceased. The cotton house was sixty or seventy feet from where the body was lying, and near where the roads come together.

The State's theory of the case was that appellant had gotten behind the cotton house and waited until Mar-

tin came more than two-thirds of the way and shot him as he passed. Gun wads were found in a direct line between the place where the weeds and grass had been tramped down by the cotton pen by some one standing there, and the place where the body laid, showing they had been fired from the same gauge gun used by the appellant and loaded with buck shot. The first wad was found about ten or twelve feet from the cotton house and the layer of thin paper, the one over the shot, was found within five or six feet of the body which was about thirty-five feet from the cotton house. The most of the shot ranged upward and the mound near which Martin fell was about a foot and a half higher than the ground at the cotton house.

The court, among others, gave the following instructions, over the objections of the appellant.

Instruction No. 5, given at the instance of the State, is as follows: "You are instructed that a bare fear of those offenses, to prevent which the homicide is alleged to have been committed, shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under this influence, and not in the spirit of revenge."

Instruction No. 7, given at the instance of the State, is as follows:

"You are instructed that in ordinary cases of one person killing another in self-defense, it must appear that the danger was so urgent and pressing that in order to save his own life, or to prevent his receiving great bodily injury, the killing of the other was necessary, as it appears to the defendant, acting without negligence on his part, and it must appear also that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline any further contest before the mortal injury was given."

Instruction No. 9, given at the instance of the State, is as follows:

"You are instructed that in order to justify the taking of life in self-defense, the defendant must have employed all the means within his power and consistent with his safety to have avoided the danger and averted the necessity of the killing, and if you find that the defendant, consistent with his own safety, could have avoided the danger to himself as it actually appeared to him, and have averted the necessity of shooting the deceased by retreating, then you are told it was his duty to retreat, and if he failed to do so, he can not plead self-defense in justification of his act."

Instruction No. 10, given at the instance of the State, is as follows: "You are instructed that before the plea of self-defense made herein by the defendant shall be available, it must have appeared to the defendant, not only that the danger to him at the hands of the deceased was imminent, but it must also appear that it was so pressing and urgent that, to save himself from death, or great bodily harm, the killing of the deceased was necessary."

*J. W. Warren, C. W. McKay* and *Wade Kitchens,* for appellant.

1. The testimony of Perkinson was inadmissible as a dying declaration. 21 Cyc. 988; 85 Ark. 300; 39 *Id.* 221; 52 *Id.* 345; 63 Ark. 382; 12 Bush. 271; 46 S. W. 217; 80 S. W. 88; 107 *Id.* 768; 20 Cyc. 976. The declarant was not *in extremis.* 2 Ark. 229.

2. Nor was the declaration admissible as *res gestae.* 85 Ark. 300; 85 Ala. 330; 66 Ark. 494.

3. The court erred in giving instruction 5. 67 Ark. 594.

4. Instruction 7 for the State, also 9, on self-defense, are not the law. Nor is No. 10. See 67 Ark. 594.

*Wm. L. Moose,* Attorney General, and *Jno. P. Streepey,* Assistant, for appellee.

1. The "dying declaration" was properly admitted as *res gestae.*

2. Instruction 5 was proper. 109 Ark. 510-515; 80 Ark. 87; 67 Ark. 594.

3.  Courts are not required to cover *all* the law in one instruction. Instructions 7 and 10 are not open to objection. 110 Ark. 402; 29 Ark. 248; 67 *Id.* 594-607; 110 Ark. 402-414; Jacobson's Dig., p. 611; 76 Ark. 515.

4.  No. 9 for the State is sustained by 76 Ark. 515. There is no error.

·KIRBY, J., (after stating the facts). (1)  It is contended that the court erred in admitting the testimony of the exclamation made by the deceased after he was shot and in giving each of said instructions. Appellant insists that the testimony of Witt Perkinson, admitted over his objections, that deceased exclaimed immediately after he was shot, "Oh! oh! Witt, he shot me for nothing," was incompetent and highly prejudicial. We do not agree with this contention. The exclamation was part of the *res gestae,* and it was necessary to make this proof to fully and correctly set out the facts of the killing. The exclamation was made by the wounded man within ten or twenty seconds, at most, after the shot was fired, and was so close in point of time as to be a part of the transaction, and it would have been difficult to give a connected and correct account of the occurrence without stating all that was said and done concerning it. As said in *Childs* v. *State,* 98 Ark. 435, "Under the law, all that occurred at the time and place of the shooting which has reference thereto or connection therewith was part of the *res gestae.*" *Byrd* v. *State,* 69 Ark. 537. "*Res gestae* are the surrounding facts of a transaction, explanatory of an act, or showing a motive for acting." *Carr* v. *State,* 43 Ark. 99. See, also, *Little Rock Traction & Electric Co.* v. *Nelson,* 66 Ark. 494.

It is next contended that said instructions given by the court deprived the accused of acting upon the appearance to him of danger and authorized the jury to find him guilty, unless they believed from the evidence that the killing was necessary to save his own life or to prevent his receiving great bodily harm.

(2)  There was no error committed in giving instruction numbered 5 complained of. It did not relate to the question of murder or manslaughter, but exclu-

sively to the question of justification of the homicide, or self-defense, and there is nothing in the testimony indicating that appellant is not a person of ordinary reason and sense. *Bruder* v. *State,* 110 Ark. 415; *Scoggin* v. *State,* 109 Ark. 515; *Hoard* v. *State,* 80 Ark. 87.

(3-4-5) Neither are instructions numbered 7 and 9 open to the objection that they precluded the defendant from acting upon the appearance to him of danger. Nor did the court intend by instruction numbered 10 to tell the jury that the defendant was not permitted to avail of the plea of self-defense, unless it appeared to them that the danger was so pressing and urgent that to save himself from death or great bodily harm the killing of the deceased was necessary. It was the purpose only to tell the jury in this instruction that it must have appeared to the defendant not only that the danger to him at the hands of deceased was imminent, etc., but also that it was so pressing and urgent that to save himself, etc., the killing of the deceased was necessary. Although the instruction says "it must have appeared to the defendant not only that the danger to him was imminent," but it must also appear, etc., intending only to say, but also or but it must also have appeared "that it was so pressing and urgent," etc., leaving it to the jury to properly consider defendant's right to act upon appearances of danger when doing so without fault or carelessness. It was not the intention, however, and the instruction did not require the jury to find that the danger was so pressing and urgent that the defendant was required to act in order to save himself nor deny him the right to act upon the appearance of danger.

The instructions given for the defendant unmistakably show that such was the court's direction, and this instruction properly construed is not in conflict with them. The court repeatedly told the jury that the defendant had the right to act under the circumstances as they appeared to him and in instruction numbered 6, after stating that the defendant relied upon the plea of self-defense, "The court instructs you that in determining

whether or not he acted within his rights under the law
of self-defense, you may render the question very simple
by adopting the rule which the court now instructs you
is the law, as follows:

*First.* "In so far as is possible, you are to place
yourself in the position and under the circumstances
surrounding the defendant at the time of the shooting,
acting without carelessness on his part, as those circum-
stances and his position have been disclosed by the evi-
dence, viewing it from the standpoint of the defendant at
the time, as you believe from the evidence it appeared to
him, you will ask:

(1) "Did it appear to the defendant at the time he
fired the fatal shot, acting without carelessness on his
part, that he was in danger of losing his life or of re-
ceiving great bodily harm at the hands of the defendant?

(2) "If it did so appear, did the defendant reach
the conclusion that he was in danger of losing his life or
of receiving great bodily harm at the hands of the de-
ceased after the exercise of such caution and prudence
in judging the appearance and circumstances by which
he was surrounded as appeared to him to be reasonably
consistent with his safety?"

The court told the jury in instruction numbered 8,
"You will note that you must place your findings upon
what you believe from the evidence the defendant, acting
without carelessness on his part, actually thought of the
circumstances and appearances by which he was sur-
rounded at the time. It is not how you think those cir-
cumstances and appearances might have affected or im-
pressed you, nor what the defendant might have done, or
ought to have done. The question for you to decide on
this issue of self-defense is, what, in good faith, acting
under the test the court has given you, the defendant
thought he ought to do. It really comes at last to this:
Was the defendant really trying to save his own life or
to prevent great bodily harm to himself, or did he shoot
deceased simply out of malice or revenge? If he shot
to save his own life or to prevent great bodily harm to

himself, acting without carelessness on his part, as it appeared necessary to him under the test above laid down, he is not guilty, and you will acquit him."

The appellant claimed to have killed the deceased in necessary self-defense, and the jury did not give credence to his statement. While it is true that seven of the eight of the charge of buckshot that entered the body and side of the deceased went through his hand, lending some weight to defendant's statement that he shot deceased when he thought he was about to draw a weapon; it is further true that most of the shot ranged upward, and if defendant had been in ten or fifteen feet of the deceased when he shot him, and shooting from his hip even as he claimed, the range of the bullets would doubtless not have been upward and most probably the entire charge would have entered the body of deceased without separating. The testimony would have warranted the conviction of the defendant of the higher degree of the offense and the instructions fairly submitted the issues to the jury.

Finding no prejudicial error in the record, the judgment is affirmed.