## COMBS *v.* STATE.

### Opinion delivered April 14, 1924.

1. HOMICIDE—SUFFICIENCY OF EVIDENCE.—Where there is evidence sufficient to sustain a conviction of voluntary manslaughter, the issue was properly submitted to the jury.

2. CRIMINAL LAW—RULING ON MOTION TO DISQUALIFY SHERIFF AND DEPUTIES.—In a prosecution for murder, the ruling of the court on a motion to disqualify the sheriff and his deputies to serve a *venire facias* for special talesmen to serve on the petit jury on the ground of partiality will not be disturbed unless there has been an abuse of discretion.

3. CRIMINAL LAW—CHART SHOWING BULLET WOUNDS ON BODY.—In a prosecution for murder committed by shooting, it was not error to allow the State to introduce a chart made by the coroner showing the location of the wounds on the body of the deceased.

4.  HOMICIDE—THREATS.—In a prosecution for murder, where there was a conflict of evidence as to who was the aggressor, it was not error to admit testimony of threats by accused against deceased, made several months before the killing, where there was evidence of a continued state of ill will between defendant and deceased from the time the threats were made until the fatal encounter.

5.  HOMICIDE—INSTRUCTION AS TO THREATS.—In a prosecution for murder, where threats by defendant were proved, it was not error to instruct the jury that any threats made by defendant toward the deceased might be considered for the purpose of shedding light on the state of mind existing between the deceased and the defendant.

6.  CRIMINAL LAW—MAP OF THE SCENE OF KILLING.—In a prosecution for murder by shooting it was not error to admit maps and plats showing the scene of the killing.

7.  CRIMINAL LAW—RES GESTAE.—In a prosecution for murder committed by shooting, a diagram showing the location of blood stains and bullet-holes found on the premises after killing was admissible as part of res gestae.

8.  WITNESSES—ALLOWING WITNESS TO REFRESH MEMORY.—In a criminal trial it was not error to permit a State's witness to refresh his memory by notes of his testimony on the subject-matter taken before the grand jury.

9.  HOMICIDE—RELEVANCY OF SHELLS FOUND ON PREMISES.—In a prosecution for murder by shooting it was not error to confine the inquiry concerning shells to those that were found on the premises immediately after the killing, or so near as to throw light upon the number of shots fired or kind of weapons used.

10. CRIMINAL LAW—RES GESTAE.—In a prosecution for murder it was error to exclude testimony that, immediately after the shooting, defendant said that the deceased "has shot me, and I think I have killed him; see what you can do for him;" such testimony being a part of res gestae.

11. WITNESSES—IMPEACHMENT BY CONTRADICTORY STATEMENT.—In a prosecution for murder, where a State's witness had testified that he had notified defendant that deceased was mad at him, and that defendant had told him that he was going down to the office of deceased and "cuss it out with him," and on cross-examination denied that he had stated, in the presence of witnesses, that the reason why he did not tell defendant that deceased was mad at him and was going to kill him was that it would do no good, it was error to exclude the testimony of such witnesses that he did make such a statement; such evidence affecting his credibility.

12. WITNESSES—COMPETENCY OF CONVICT.—Under Crawford & Moses' Dig., § 4145, convicts, as such, are not disqualified from testifying.

13. WITNESSES—IMPEACHMENT.—Where defendant testified that he was known by either of two names in Kentucky, where he was raised, the matter being merely collateral, it was error to permit the State to contradict him by proving that he was known in Kentucky by only one of such names, which was different from the name which he went by in Arkansas.

14. CRIMINAL LAW—RES GESTAE.—On a murder trial, evidence of a witness that he saw defendant immediately after the killing, and that he accused the witness of causing him to be shot, in not telling him that deceased intended to shoot him, was competent as *res gestae,* and as tending to contradict a former statement of the same witness that he had told defendant that deceased was angry and for him not to go in there for a while, and that defendant ran his hand in his pocket and walked in there.

Appeal from Garland Circuit Court; *Earl Witt,* Judge; reversed.

*Richard M. Ryan, Gibson Witt, Sr., N. A. McDaniel* and *South Strong,* for appellant.

*J. S. Utley,* Attorney General, *John L. Carter, Wm. T. Hammock, Darden Moose* and *J. S. Abercrombie,* Assistants, for appellee.

WOOD, J. This is an appeal from a judgment of the Garland Circuit Court sentencing the appellant to imprisonment in the State Penitentiary for a period of five years. We find that there are some errors in the record for which the judgment must be reversed, and the cause remanded for a new trial. We will therefore discuss only these errors and such other grounds of appellant's motion for a new trial as we deem necessary to properly guide the court on issues that may likely be raised at another trial.

The indictment is valid, and, in approved form, charged the appellant with the crime of murder in the first degree in the killing of W. A. Matthews, which charge also embraces voluntary manslaughter, the crime of which appellant was convicted. While the verdict of the jury did not find appellant guilty of voluntary manslaughter,

the punishment fixed by the jury necessarily shows that voluntary manslaughter was intended. See §§ 2367-2368, Crawford & Moses' Digest. *Bettis* v. *State,* 164 Ark. 17.

1. About four o'clock on the afternoon of August 4, 1923, the appellant shot and killed Matthews in the latter's office in the city of Hot Springs, Arkansas, by shooting him four times with a pistol. There were no eye-witnesses to the actual rencounter. According to appellant's version, he entered Matthews' office on business, and, immediately upon entering the office, Matthews approached him with a shotgun leveled upon him. The appellant begged him not to shoot him, and jumped from left to right several times in an endeavor to get out of the way, when finally Matthews fired one barrel of his gun at a distance of eight or ten feet, and appellant fell to the floor. Matthews rushed upon him, and pressed the gun up against appellant's body. Appellant grabbed the muzzle of the gun and raised himself up, and they struggled back and forth across the floor of the office. The appellant backed Matthews against the left wall, and, while they were still struggling, appellant pulled his pistol and fired into Matthews. They both fell to the floor. Appellant pulled himself up, and staggered out of the office across the street. Appellant had no ill will toward Matthews, and was not expecting any trouble with him.

Several witnesses, who were in proximity to Matthews' office at the time of the rencounter, testified for the State to the effect that they heard the sound of shots as of a small gun before they heard the sound as of a large gun. The witnesses designated the louder reports as shots from the shotgun—the big gun—and the other reports as the shots from the small gun—the pistol.

There was some testimony on behalf of the State to the effect that Matthews was running a stave-mill, and that he had been informed that appellant was cutting his ties and selling them, and that Matthews was angry at appellant on that account; that, on the day of the killing,

a witness, who knew that Matthews was very angry with appellant, informed appellant of that fact, and appellant said that he was going down to Matthews' office and "cuss it out with him;" that appellant said this ten or fifteen minutes before the shooting, and was going towards Matthews' office at the time. There was testimony to the effect that, in March previous to the killing, the appellant had said that he would kill that "damned old son of a b—— if he ties into me and fools with me."

The physical facts surrounding the shooting were detailed in evidence before the jury. There was abundant evidence to corroborate the testimony of the appellant, and to sustain his contention that he killed Matthews in necessary self-defense; and, if the testimony in his behalf had been credited by the jury, it would have warranted a verdict of not guilty. On the other hand, the testimony adduced by the State was sufficient to warrant the jury in finding the appellant guilty of voluntary manslaughter. So the issue of appellant's guilt or innocence, under the evidence, was an issue of fact for the jury.

2. The appellant moved to disqualify the sheriff and his deputies to serve the *venire facias* for special talesmen to serve on the petit jury, alleging that the sheriff and his deputies were so prejudiced against him that they could not act impartially in summoning the talesmen. Testimony was adduced by the appellant to sustain his motion, and the court, after hearing the motion, sustained the same as to the sheriff's deputies but overruled same as to the sheriff himself, and directed the sheriff to personally summon the special talesmen.

Upon the evidence adduced on the hearing of the motion the court did not err in its ruling. The ruling of the court on this issue must be judged by the testimony adduced at the hearing, and not by any alleged misconduct of the officer after the jury was impaneled and the cause submitted. The appellant testified on the motion that, from what he had heard from his friends and other people, he did not believe that the sheriff would

summon a fair and impartial jury. But duly qualified officers cannot be disqualified upon the opinion of prisoners, based upon hearsay that such officers are so prejudiced that they would not be impartial in the discharge of their sworn duties. In such matters the trial judge is necessarily vested with large discretion, and his ruling will not be disturbed unless it clearly appears that there has been an abuse of his discretion.

3. There was no error in allowing the State to introduce a chart or plat made by the coroner, Dr. Randolph, who, immediately after the killing, examined the dead body of Matthews. This plat described the location of the wounds on Matthews' body, showing the places of entrance and exit of the bullets which resulted in the death of Matthews. Dr. Randolph testified that this plat was a correct representation of what it purported to show. *Hankins* v. *State*, 103 Ark. 28.

4. Witness Virgil Spear testified, over the objection of appellant, that, some time along in March, 1923, Mr. A. A. Mandrell had given appellant a letter that Matthews sent appellant. Appellant was mad about it, and was talking to Mandrell, and said: "I am going in to town and I will kill that damned old son of a b—— if he ties into me and fools with me." Mandrell testified that in March, 1923, he had a conversation with appellant about Matthews. Matthews had sent a letter by witness to appellant. Witness delivered the letter to appellant, and it was so dark at the time he could not read it. Appellant rammed the letter down in his pocket and said, "That is two I have got today from the damned old son of a b——." Appellant further said, "If he had come up here himself I would have blowed his G—— d—— brains out," and further said, "If old Bill Matthews don't quit fooling with me I will blow his G—— d—— brains out. I have took about as much off of him as I am going to take."

The appellant objected to the above testimony, on the ground that the threats were too remote.

As we have just seen, there was some testimony to the effect that the appellant, on the very day of the killing, and while he was on his way to Matthews' office, stated that he was going down there to·"cuss it out with him." It is admitted that he went to Matthews' office armed with a pistol. While the testimony on behalf of appellant was to the effect that there was no ill-will between himself and Matthews, and that he did not anticipate any trouble with him, nevertheless there was testimony on behalf of the State tending to prove that there was ill-will between them, and these threats of appellant were not so ambiguous in meaning and remote in time as to render them incompetent testimony, as was the case in *Billings* v. *State,* 52 Ark. 503, upon which appellant relies. On the contrary, these threats were very pointed and definite, and tended to show a mental status on the part of appellant towards Matthews that was far from friendly. "Threats are circumstantial facts and a part of the *res gestae* when so connected with the conduct of the parties as to explain their motives." *Palmore* v. *State,* 29 Ark. 248. Where the point is in doubt as to who was the aggressor, uncommunicated threats are admissible as tending to throw light upon that issue, if they are sufficiently definite in fact to involve a threat, and sufficiently near in time to indicate present ill-will towards the person about whom they are made. *Casat* v. *State,* 40 Ark. 511; *McGough* v. *State,* 119 Ark. 57; *Lee* v. *State,* 72 Ark. 436.

It follows, from what we have said, that the court did not err in admitting the testimony of Spear and Mandrell, and it also follows that the court did not err in giving instruction No. 20, to which appellant objected, in which the court told the jury that, in determining who was the aggressor, "you may also take into consideration any threats made by the defendant toward the deceased; that any such threats, if any, may be taken into consideration by you for the purpose of shedding light on the state of mind existing between the deceased and the defendant."

5. Appellant assigns as error the ruling of the court in permitting the State to introduce maps and plats showing a diagram of Matthews' office, where the killing occurred. Witnesses testified that these plats were a correct representation of the premises. Appellant also objected to the testimony in regard to blood stains and bullet holes found on the premises. This was all competent testimony. The plats would enable the witnesses to point out to the jury the locations and distances, and bring to the jury, in a clearer way than they otherwise could, the facts within their knowledge about which they were testifying. The blood spots and bullet-holes were a part of the *res gestae*; they were physical evidences concerning the rencounter which were relevant and competent for whatever light they might throw upon it. *Hornsby* v. *State, ante* p. 396, and cases there cited; *Ragland* v. *State,* 71 Ark. 65; *Hankins* v. *State, supra.*

6. The court did not err in permitting the State to refresh the memory of its witness, Akers, by notes of his testimony on the subject-matter thereof taken before the grand jury. It is not contended that the testimony itself was irrelevant, but only that the witness should not be permitted to refresh his memory from the notes taken before the grand jury. There was no error in the court's ruling.

7. Witness Akers, on re-cross examination by counsel for appellant, was asked the following question: "Now those three shells that Mr. Wakeland presented to you, where did he claim that he found them?" The court ruled that it was not proper "to go into another three shells; that the shells that had been introduced in evidence were the only ones that the jury could consider." The appellant excepted to this ruling of the court. There was certainly no error in the ruling of the court in confining the inquiry concerning the shells to those that were found on the premises immediately after the killing, or so near as to throw light upon the number of shots fired, weapons used, etc. For aught that this record shows, the court was endeavoring, by its ruling, to limit the

inquiry to that situation by not permitting the introduction of shells that were not found on the premises after the shooting, and which therefore were not relevant to the issue as to the number of shots fired or the character of the weapon used in the killing of Matthews.

8. It would unduly extend this opinion to discuss the remainder of the forty-six assignments of error which appellant's counsel urge as grounds for the reversal of the judgment. We will therefore dispose of the numerous other assignments by saying that we find no reversible error in these rulings of the court, except the following:

(a) The appellant offered to prove by several witnesses that, immediately on hearing the report of the small gun, they saw appellant walking across the street from Matthews' office, some fifty yards away. One of them assisted appellant to a chair, and appellant said, "Matthews has shot me, and I think I have killed him; see what you can do for him." The court would not allow this testimony. In this ruling the court erred. These declarations of the appellant, coming immediately after the rencounter and so close to it, should have been received as a part of the *res gestae.* There was no time for reflection and dissimulation. They were spontaneous exclamations, coming from the excited brain of one of the actors, just emerging from the scene of conflict, without any time to disguise his feelings and to resort to subterfuge.

In the case of *Outler* v. *State,* 154 Ark. 598-600, the facts were quite similar. The appellant, who had killed a man and his brother, immediately after the fatal rencounter rushed into the presence of an excited crowd, cursing and commanding the people to stand back, and, among other things, said, "He come out there and drawed a damn little short gun on me like this." And further said, "If any damn son of a b—— wants to be deputized, come on." We held that these declarations were part of the *res gestae,* and were competent. While declarations made by the accused immediately after the commission of the crime are always to be received with cau-

tion, yet if they are so immediate and made under circumstances which preclude the idea of reflection and the possibility of concocting a story showing a motive on the part of the actor to excuse, palliate, or justify himself, then they are competent for the reason, as stated in *Carr* v. *State,* 43 Ark. 99-104, that they "stand in immediate causal relation to the act and become a part either of the action immediately preceding it or of the action which it immediately precedes." In other words, such declarations are a part of the surrounding facts of the transaction explanatory of it, rather than showing a disguise or subterfuge to escape its consequences. They are verbal acts, so to speak, growing out of the rencounter, and are a part of it. *Cornelius* v. *State,* 12 Ark. 782; *Childs* v. *State,* 98 Ark. 435, and cases there cited; *Plumley* v. *State,* 116 Ark. 17; *Stevens* v. *State,* 117 Ark. 64.

The offered testimony was competent for the consideration of the jury, and they might have concluded that these declarations of the appellant, under the circumstances, were corroborative of his testimony at the trial to the effect that Matthews was the aggressor. At any rate, the testimony was competent for whatever effect it may have had in the minds of the jury in determining the guilt or innocence of the appellant.

(b) Witness Herron testified for the State that, on the day of the killing, he met the appellant going towards Matthews' office, and that he told appellant that Matthews was mad at him, and that appellant said that he was "going down there and cuss it out with him." Herron, on cross-examination, was asked by counsel for appellant if he did not state, in the presence of witnesses Henry Grantham and Mrs. Grantham, on the Sunday after the killing, that the reason why he did not tell the appellant that Matthews was mad at him and going to kill him was because he didn't think it would do any good. Herron answered that he did not make the statement.

The appellant, in rebuttal, offered to prove by the Granthams that Herron did make this statement in their

presence.    The court ruled that the testimony of the
Granthams to the effect that Herron told them, on the
Sunday mentioned, that he was down at Matthews' office
and that he knew that Matthews was going to kill appel-
lant, was proper, but that the part of their testimony
in which they say that Herron also stated that the reason
he didn't tell appellant that Matthews was there with
his shotgun to kill him when he came in at the door,
was because he didn't think it would do any good, was
improper because it was the mere expression of the opin-
ion of the witness Herron.    The court erred in excluding
this testimony.    It was very material, as affecting the
credibility of Herron.    The jury had a right to consider
the reason Herron gave for not telling appellant, when he
knew that appellant, as the witness himself said, was
going to Matthews' office, and that Matthews was mad
at appellant, had his shotgun, and was ready to kill appel-
lant.    The jury might have concluded that, if the facts
to which Herron testified were true, he would have com-
municated same to appellant; that it would have been
wholly unreasonable for any right-thinking man with
normal impulses not to have done so, and that therefore
the testimony of Herron was unworthy of belief.

(c)    The appellant, in answer to question, stated
on cross-examination, that, in Breathitt County, Ken-
tucky, where he was born, his mother died when he was
a very small boy, his father left Kentucky, and he was
reared by foster parents to manhood, and took their
name of Combs.    His real name was Tom Barnett.    His
grandmother on his mother's side was named Combs, and
he took the initials "J. L." of his grandfather on his
mother's side, when he left Kentucky.    Everybody knew
the circumstances under which he was brought up.    He
was known in the same place — Breathitt County — by
some people as Tom Barnett and by some as J. L. Combs.
The State introduced a witness by the name of Cornett,
a convict in the State Penitentiary, who testified that he
knew appellant in Breathitt County, Kentucky.    He was
asked if appellant was known by any other name than

Tom Barnett in Breathitt County, and answered, "No sir; not to my knowledge." This witness further testified that he saw appellant at Pennington Gap, Virginia, and his name there was Tom Barnett, and, so far as witness knew, appellant was not known by any other name there. Witness met appellant at El Dorado, in this State, about February, 1922, and recognized him and called him Tom.

Appellant objected to the above testimony of the witness Cornett, on the ground, first, that he was not a competent witness, and second, on the ground that his testimony was concerning a collateral matter. The court overruled the objection, and appellant duly excepted to the ruling. The fact that the witness was a convict did not render him an incompetent witness. Section 4145, C. & M. Digest. But the court erred in permitting the witness to testify that, in Breathitt County, Kentucky, appellant went under the name of Tom Barnett, and not under any other name, so far as witness knew. The court should not have permitted the testimony of this witness, because it was concerning collateral matters. The State had elicited these on the cross-examination of appellant, and it was bound by his answers. It could not introduce a witness to contradict him. *Butler* v. *State,* 34 Ark. 480; *Plunkett* v. *State,* 72 Ark. 409; *Selters* v. *State,* 93 Ark. 313; *McAlister* v. *State,* 99 Ark. 604. The testimony of the witness was exceedingly prejudicial to appellant.

(d) The court would not permit Lem Burke, a witness for the appellant, to testify that he saw appellant when he came out of the door of Matthews' office, after the shooting; that he was all stooped over, running the best he could up the sidewalk, coming that way. He was running, and bloody as he could be. He came right over there, and they set a chair out there, and he sat down; he ran up and said, "Burke, you caused me to get shot." I said, "I told you not to go in there; I didn't know he was going to shoot you." He asked me, "Why didn't

you tell me the old man was aiming to shoot me?'' I said, ''I didn't know it, Mr. Combs, I swear I didn't.''

The above testimony should have gone to the jury. The statements made by appellant, under the circumstances disclosed by Burke's testimony, constituted a part of the *res gestae,* for the same reason given in subdivision ''a,'' which we will not repeat. The testimony was also relevant because it tended to contradict the former statement made by Burke himself, to the effect that he had said to appellant that Matthews ''was on his ear a little bit,'' and further said to appellant, ''Oh, I wouldn't go in there for a while,'' whereupon appellant replied, ''Oh, hell,'' or ''Hell, yes,'' and ran his hand in his pocket, and walked in there. The last testimony of Burke as to the statements of appellant immediately after he was shot tended to prove that appellant went into Matthews' office wholly unsuspecting that Matthews was mad and might do him violence, whereas Burke's former statement in his testimony tended to prove that appellant, after being fully advised, voluntarily sought the rencounter which had such a tragic ending. The jury might have found that the testimony of Burke was contradictory in itself. The court erred in not admitting the testimony as above set forth. The charge of the court, as a whole, fully and correctly declared the law applicable to the facts.

We find no other reversible errors in the record, but, for those indicated, the judgment must be reversed, and the cause remanded for a new trial.