BURRIS *v*. STATE.

## Opinion delivered June 15, 1925.

1. HOMICIDE—RELEVANCY OF EVIDENCE.—In a prosecution for murder when the killing occurred during a dispute over an account which deceased alleged was owing by defendant, evidence that deceased improperly failed to give credit on another man's account was incompetent.

2. CRIMINAL LAW—STATEMENT OF FACT.—In a prosecution for murder, where a witness was asked what, if anything, deceased did toward making an attack on defendant, his reply that he made no attack was the statement of a fact, not of a mere conclusion.

3. HOMICIDE—THREATS.—In a prosecution for murder, testimony that deceased told M. that M. ought to go and give defendant a whipping was properly excluded, as it was not a threat of violence on deceased's part, and defendant was not entitled to prove it as material or to contradict M. in regard to his statement concerning it.

4. CRIMINAL LAW—COURT'S MISUNDERSTANDING OF QUESTION.— Where the trial court, in refusing to permit a propounded question to be answered, misunderstood the question, it was counsel's duty to remove such misunderstanding.

5. CRIMINAL LAW—SELF-SERVING STATEMENTS OF ACCUSED.—Where insanity was one of the defenses in a murder case, oral and written statements made by defendant to others that he believed himself to be insane were self-serving declarations and incompetent.

6. CRIMINAL LAW—EXCLUSION OF EVIDENCE—HARMLESS ERROR.— In a murder trial, where one of the defenses was insanity, refusal to permit an expert to testify whether defendant would be capable of determining the difference between right and wrong was harmless where he had already testified that defendant would not be capable of deliberation and premeditation with

reference to his acts under excitement, since the answer of the witness to the excluded question would have been a mere repetition.

7. CRIMINAL LAW—SELF-SERVING DECLARATION.—In a murder trial, testimony of a witness that, immediately after the killing, defendant stated to him that deceased forced him to do what he had done to protect himself was incompetent as part of *res gestae*.

8. WITNESS—TESTIMONY OF FAMILY PHYSICIAN.—In a murder trial, the testimony of physicians as 'to defendant's mental condition, based on mere observation of defendant during their attendance as family physician and by observing him on the witness stand, but not from any information received for the purpose of treating him, *held* admissible, as Crawford & Moses' Digest, § 4149, only excludes testimony of a physician received while attending the patient in a professional character, and which was necessary to enable him to prescribe as a physician.

9. CRIMINAL LAW—REPETITION OF INSTRUCTIONS.—Defendant's requested instruction on the subject of reasonable doubt was properly refused when covered by the charge given.

Appeal from Sevier Circuit Court; *B. E. Isbell,* Judge; affirmed.

*E. K. Edwards, James S. Steel, Abe Collins* and *DuLaney & Steel,* for appellant.

*H. W. Applegate,* Attorney General, and *Darden Moose,* Assistant, for appellee.

McCULLOCH, C. J. Appellant was indicted by the grand jury of Little River County for the crime of murder in the first degree, alleged to have been committed by killing Lillard Johnston. The case was transferred to Sevier County on appellant's petition for change of venue, and the trial resulted in appellant's conviction of murder in the second degree.

It is undisputed that appellant shot and killed Lillard Johnston—it was so conceded on the trial—but it was contended on behalf of appellant that he acted on what appeared to him to be imminent danger of death or great bodily harm about to be inflicted by the deceased, so as to justify appellant in firing the fatal shot in necessary self defense. It is also contended that appellant was

insane at the time of the encounter which resulted in Johnston's death.

The killing occurred on January 2, 1925, in the town, or village, of Ogden, in Little River County, at a garage and gasoline filling station formerly operated by appellant. Johnston lived at Ashdown and was the district agent of the Magnolia Petroleum Company, a corporation selling and distributing motor oils and gasoline. Appellant had been purchasing oil and gasoline from Johnston, but had recently gone into bankruptcy, and the business had been purchased and was being operated by a man named Wood.

Johnston, accompanied by J. J. Matthews, the State's principal witness, drove over from Ashdown on the morning that the killing occurred, for the purpose of collecting from appellant an account of $409, claimed to be unpaid and due from appellant to the oil company. Appellant claims that he made a settlement with Johnston prior to that time, and that he owed the company very little, if anything. Witness Matthews, who, as before stated, was the State's principal witness, testified that he and Johnston drove over from Ashdown that morning to see appellant about paying the balance of his account; that they first drove to appellant's residence and were informed by the latter's wife that he was at the garage, but that when they reached the garage they were told that appellant was across the railroad track at the store of Hull & Furlow, and they then proceeded to that store, where they found appellant and left there with him to walk back to the garage, which was situated on the west side of the railroad, facing south on the street or road which crossed the railroad at right angles east and west. Matthews' narrative of the incidents thereafter occurring is as follows: After remaining in Hull & Furlow's store a few minutes, appellant started out of the door, with Johnston and witness following, and as they went out of the door appellant inquired of Matthews if they wanted to see him, and Matthews replied that he did, and appellant said, "Make it

snappy, for I am in a hurry.'' The three men started walking across the railroad, in the direction of the garage, and appellant stated that he had filed a petition in bankruptcy, that he had heard that Johnston was personally responsible for all of the account except $100, and he felt like they (Matthews and Johnston) ought to have advised him before that; that Johnston replied, ''I have told you two or three times that I only had an authorized credit for $100,'' and appellant disputed that statement. They continued walking towards the garage with appellant doing most of the talking, and he offered to pay $59 that had been charged to Johnston on commission account. Witness asked appellant whether he had sold the gasoline and oil on hand, and appellant replied that he had not. In the conversation it was mentioned that appellant's mother had sold the garage building to Mr. Wood, and that the oil and gas on hand were listed in the bankruptcy proceedings as assets. Witness stated that just as he was on the point of turning to leave them Johnston said to appellant, ''I am deceived in you, and don't appreciate a bit the way you have done about it,'' whereupon appellant replied ''I am not going to take any abuse;'' then Johnston said, ''I have said it, and am not going to take it back, and do not appreciate it a damn bit.'' The two men were from four to six feet apart at that time, and appellant then remarked that he did not intend to take any rough talk, and Johnston said that he ''staid by his statement and did not appreciate it a damn bit,'' adding the remark to appellant, ''Burris, you are a low-down dirty crook.'' Appellant had his hand in his overcoat pocket all the time, and at this point he drew his pistol and fired immediately, two shots being fired in quick succession. At the first shot Johnston said, ''Why, Burris!'' and then began to crumple and stagger or fall for a distance of four or six feet, and that when the second shot was fired he cried ''Oh!'' and fell to the ground. He died almost immediately. Witness then

asked. for a telephone so that he could call a doctor, and appellant said, "Run over to the store and call the doctor quick; I have played hell; he is as good a friend as I had." Witness testified that Johnston had on an overcoat, and gloves on both hands, and that his hands were held down but were not in his pockets.

There is a conflict in the testimony, appellant giving a different account of what happened, though he agreed with witness Matthews as to some of the things that were said.

Appellant's narrative was that he had had a settlement with Johnston previous to that day, and that when he went into bankruptcy he owed nothing to Johnston or to the oil company except the sum of $13.50 for two barrels of oil; that he had heard that Johnston had said that he was coming over there to have a settlement with him or have trouble, and that he knew that Johnston always carried a pistol; that after he and Johnston and Matthews got to the garage and the conversation was continuing concerning Johnston's claim of indebtedness and the bankruptcy, and appellant not owning the building, Matthews said, "I have information that you sold out for $4,100 in cash," and added, with an oath, that he (appellant) had put Johnston "in a hell of a bad light," and that Johnston was going to have to pay the account to his company; that Johnston then said, "Yes, Burris, as much as I have done for you, you have acted a low-down son of a bitch from start to finish," and appellant replied, "Lillard, I do not feel like being talked to like that," and that Johnston said, "Well, I have not said a God damn word to take back, you God damned low-browed son of a bitch, I am going to stamp your head off." Johnston, according to appellant's narrative, then lunged forward and grabbed appellant with his left hand and grabbed for the pistol and attempted to wrench it from appellant's hand, and appellant fired the pistol, but was unable to state how many shots he fired. He said that when

he fired the pistol, Johnston stopped and backed off and leaned over and fell. The undisputed testimony is that Johnston was unarmed.

Appellant testified on cross-examination that when Johnston grabbed his hand, he (Johnston) threw one of his hands into his pocket and tried to get appellant by the collar and struck him in the breast. He stated that Johnston grabbed the gun with his left hand. Appellant's testimony is not very clear as to whether he shot because Johnston threw his hand in his pocket or because he was trying to wrench the pistol out of his hand, but at any rate his claim was that Johnston was engaged in an assault upon him, either to get the pistol away from him or to draw one from his pocket, and he thought his life was in danger and fired the shot. There was enough to justify the submission of the question whether or not appellant fired the shot under the apprehension of danger or violence from Johnston, and the court did in fact submit that issue in sufficient instructions.

Another witness for the State testified that he was standing on the front porch of a store on the east side of the railroad, and something attracted his attention to the parties over in front of the garage, whereupon he walked out a few steps and witnessed the encounter from a distance of about ninety steps; that he heard the report of the pistol shots and saw Johnston fall to the ground, and that at the time this occurred the two men were six or seven feet apart. He further testified that he went over to the place where the body was lying and found that Johnston had on his overcoat and gloves and had nothing in his hand, that the gloves were either canvas or knit gloves. He said that there was no scuffling at the time or before the shooting; that appellant was standing with his back to the garage and that Johnston's hands were not in his pockets.

There was another eye-witness, introduced by appellant—a man named Crouch—who was working at the

garage at the time, and he corroborated the statement of appellant, that Johnston had hold of appellant's hand and that the two men were scuffling, and that Johnston was following up appellant, who was attempting to retire, when the latter fired the fatal shot. There was other testimony introduced in the case, but there were only three witnesses who claimed to have seen what occurred at the time of the killing.

The assignments of error are very numerous, there being fifty-eight assignments in all, relating to all phases of the evidence and to the court's charge and in refusing to give instructions requested by appellant.

It is first contended that the court erred in refusing to permit appellant to prove by witness Matthews that Johnston had failed to credit the account of one O'Connell, a customer of the oil company, with certain amounts that had been paid. Counsel contend that this evidence was competent as shedding light on the contention that Johnston was presenting a false account against appellant and was endeavoring to force the latter to pay it. It was competent, of course, to prove the claims made by both Johnston and appellant at the time of the encounter with respect to the state of the account, which appears to have been the cause of the rupture between the two men, but the fact that Johnston had improperly failed to give credit on another man's account had no bearing upon the question involved in this trial. The only effect it could have had would have been to impeach the character of the dead man for honesty, and we know of no rule of law which would permit that to be done.

It is next contended that the court erred in admitting the following question and answer in the cross-examination of witness Matthews: "Q. What, if anything, did Johnston do toward making an attack upon Burris? A. There was no attack made." The contention is that this was merely the statement of a conclusion, and that the witness should not have been permitted to do that. We do not think that this was a statement of

a conclusion, but one of fact, namely, that Johnston made no attack. The word "attack" defines itself, and when the witness said that no attack was made he stated a fact, not a conclusion.

In the testimony of witness Wood, who was introduced by the appellant, the following question was sought to be propounded: "Q. Did J. J. Matthews at that time tell you that Mr. Johnston said that he extended more credit to Burris than was allowed, and that Johnston told him that he ought to go down there and give Burris a whipping?" This question had been propounded by appellant's counsel to Matthews on cross-examination, and Matthews had replied in the negative. The court refused to permit the witness Wood to answer the question. There is a long colloquy in the record between the trial judge and counsel with respect to the form of the question and the effect of it. The court stated to counsel that they were entitled to prove threats on the part of Johnston against appellant, and also were entitled to show contradictory statements of witness Matthews on material matters in order to impeach his credibility, but that this question would not elicit proof of a threat on the part of Johnston or a contradictory statement of Matthews on material matters. We think that the court was correct in its ruling. The question related to an alleged statement of Johnston to the effect that witness Matthews—not Johnston himself—"ought to go down there and give Burris a whipping." That is the way we understand the question, and evidently the trial court understood it that way. Now, it would have been competent to prove a threat of Johnston and also to impeach witness Matthews as to a contradictory statement concerning this threat, for proof of the threat was a material matter, but Johnston's statement that Matthews ought to whip appellant was not a threat of violence on Johnston's part; therefore appellant was not entitled to prove it as a material matter or to contradict witness Matthews in regard to his statement concern-

ing it. If the trial judge misunderstood the question propounded to the witness, it was the duty of counsel to remove that misunderstanding, as it is evident from the colloquy between court and counsel that the court had a correct conception of the law and was willing to admit competent evidence of threats and also impeaching evidence.

In bringing forward proof of appellant's mental condition, his counsel introduced numerous witnesses, both expert and non-expert. The non-expert witnesses related their experience and observation of appellant and stated that they considered appellant to be mentally unbalanced. Appellant's mother testified in the case concerning his condition from childhood up to the date of the trial, and her testimony tended to show appellant was insane.

There are assignments of error with respect to the court's refusal to permit two of the witnesses—appellant's mother and a witness named Hull—to testify concerning statements made by appellant to them orally and also in writing. These statements were in substance to the effect that appellant was insane. Witness Hull would have testified that he received a letter from appellant stating that physicians had advised him that he (appellant) was bordering upon insanity. Appellant's mother testified that at one time appellant, while working on some machinery, had said to her "Don't bother me; you can't realize the condition I am in; I don't know a thing." These were statements of self-serving declarations of the appellant himself and were not competent. Of course, the non-expert witnesses should have been permitted to tell of their observations of appellant and of any unusual conduct of his which tended to show that his mind was unbalanced, but a mere statement, whether made orally or in writing, that he believed himself to be insane, was not such a statement as could properly form the basis of an opinion as to his mental condition. These witnesses were allowed to testify as to other facts which

influenced them in concluding that appellant was mentally unbalanced. His mother testified as to his condition from infancy, giving an account of diseases which had begun in early childhood and relating many instances upon which she based her conclusion that he was not of sound mind. We think there was no error committed by the court in excluding the testimony concerning appellant's statement of his own mental condition.

Dr. Kitchens was introduced by appellant as an expert witness and testified fully as to his observation of appellant and his opinion concerning the latter's mental condition. Error is assigned on the court's refusal to permit the following question to be asked: "Under his condition, as you have observed it, and the history of the case, do you think that under excitement he would be capable of determining the difference between the right and the wrong thing to do with reference to any specific act?" Of course, appellant was entitled to prove the substance of the matter which this question would have elicited, namely, as to whether or not appellant was capable of knowing the difference between right and wrong with reference to the specific act under investigation (*Bell* v. *State,* 120 Ark. 530), but the witness was permitted to cover the same ground in another statement. After giving the full history of the case as derived from his own observation, and even as to what other physicians had told him, Dr. Kitchens stated his opinion to be that appellant was insane and had been so for about two years. He made the following statement: "I don't think that he would be capable of deliberation and premeditation with reference to his acts under excitement." Now, this latter statement was a sufficient answer to the inquiry which the court afterwards excluded, and the answer of the witness would have been a mere repetition of what he had already said. Therefore, there was no error in the court's refusal to permit the question to be in substance repeated.

Appellant offered to prove by witness Crouch, who claims to have been standing in front of the garage door at the time the killing occurred, that immediately after the shooting appellant walked into the garage and made this statement to him, "Frank, I would not have done it for anything in the world, but he forced me to do it to protect myself." The contention is that this testimony was competent as part of the *res gestae*. If the alleged statement had been one concerning a fact, and not a mere conclusion, it would, we think, have been competent under the rules stated by this court in *Combs* v. *State*, 163 Ark. 550; but we think that the statement was nothing more than a conclusion to the effect that appellant had been forced to fire the shot in order to protect himself, which was no more than a statement that he had acted in self-defense. If he had made a statement at that time and under those circumstances concerning a specific act of Johnson which led appellant to believe that he was in danger, the statement would have been competent. The court was correct in refusing to allow this statement of a conclusion to go to the jury as part of the *res gestae*.

It is contended that the court erred in permitting the State to introduce in rebuttal two physicians, Dr. York and Dr. Phillips, concerning appellant's mental condition. These physicians both testified that they had been acquainted with appellant for a number of years, had practiced in his family, and had treated him for disease on different occasions. Over the objection of appellant they were permitted to testify as to his mental condition. The statute on this subject reads as follows:

"Section 4149. No person authorized to practice physic or surgery, and no trained nurse shall be compelled to disclose any information which he may have acquired from his patient while attending him in a professional character, and which information was necessary to enable him to prescribe as a physician or do any

act for him as a surgeon or trained nurse." Crawford & Moses' Digest.

It will be observed that the statute only excludes the testimony of a physician as to information "necessary to enable him to prescribe as a physician." The statute does not exclude all of the testimony of a physician because he had attended the person in a professional capacity, but the exclusion is limited to information which was necessary to enable the physician to prescribe. Neither of these witnesses had ever examined appellant as to his mental condition or treated him for mental disease, and they both testified that they were basing their opinions upon mere observations of the appellant during their acquaintance with him as family physician and by observing him while he was on the witness stand, but not from any information received for the purpose of treating him. It is true that one of the physicians said that on one occasion he gave appellant medicine for a nervous trouble, but he did not examine him with a view of ascertaining his mental condition, or treat him for any mental disease.

Counsel rely mainly upon the announcement of the law on the subject made by this court in the case of *Triangle Lumber Co.* v. *Acree,* 112 Ark. 534, but we find nothing on examination of the opinion in that case which would justify us in holding that this testimony was incompetent. There is nothing in the opinion to justify the conclusion that we meant to ignore the distinction that under the statute the testimony of a physician is not to be excluded except such as related to information essential to the treatment of the patient. Both of these physicians were cross-examined by counsel and by the court with reference to the basis of their opinions, and the answers of the physicians justified the court in holding that the opinions were not based upon information received which was necessary for the physicians to prescribe.

This covers all the assignments of error with respect to the introduction of testimony.

The assignments of error with regard to the court's charge are too numerous to discuss in detail. We have examined them all, and find that every phase of the case was properly submitted to the jury. The court gave twenty-four instructions at the instance of the State and fifteen at the instance of the appellant, covering all questions relating to the law of self-defense and insanity, and the law as to the burden of proof and reasonable doubt. Many of the assignments relate to refused instructions which we find were fully covered by other instructions given by the court at the instance of the State as well as the appellant. This is particularly true as to the instructions on the subject of reasonable doubt, which was very fully covered by the court charge.

Upon the whole, we find that the record is free from prejudicial error, and the judgment is therefore affirmed.