Smith v. State.

Opinion delivered June 9, 1919.

1. HOMICIDE—INSTRUCTIONS—SELF-DEFENSE.—Where the State's theory was that, after a previous quarrel, defendant armed himself and hunted up deceased for the purpose of killing him and was the aggressor, and defendant's theory was that deceased was the aggressor, an instruction upon self-defense was held not objectionable as not telling the jury that defendant was not bound to retreat if he was first assaulted by deceased with a murderous intent.

2. HOMICIDE—INSTRUCTION.—An instruction that, the killing being proved, the burden of proving circumstances that would justify or excuse the homicide shall devolve on the accused, unless the State's proof sufficiently manifests that the defense only amounted to manslaughter or that the accused was justified or excused in committing the homicide, was correct.

3. CRIMINAL LAW—REPETITION OF INSTRUCTIONS.—A proper request for instruction was properly refused where it was covered by other instructions given.

Appeal from Lafayette Circuit Court; *George R. Haynie,* Judge; affirmed.

STATEMENT OF FACTS.

Bob Smith was indicted for murder in the first degree charged to have been committed by killing John Blunt.

According to the testimony of W. H. Scott, Bob Smith and John Blunt got into a quarrel in a pool room owned by a brother of Smith in Bradley, Lafayette County, Arkansas, one night in October, 1917. Several parties had been playing pool and Scott made a bet with Smith that Blunt would win the next game. Blunt wanted to quit playing and started to put up his cue. Smith told him that he could not quit and began cursing him about it. Smith then started towards Blunt with his cue in his hand. Blunt pulled his pistol, cocked it, and told Smith not to come any further. One of Smith's brothers and others took him out of the front door of the pool hall, and Scott and another person took Blunt out the backway. Blunt and his companions first went to a drug store and then to a restaurant for the purpose

of getting something to eat. Smith and his companions came into the restaurant while Blunt and his companions were there. Smith told Blunt that he was going to kill him the next morning, or as soon as he could get something to kill him with. Smith and his companions left the restaurant first. Subsequently Scott and Blunt left the restaurant to go to a hotel where they intended to occupy the same room. They stopped on the way by a fire which had been built by a negro who was running a merry-go-round. While standing by the fire Smith and his companions passed them. While they were passing Blunt changed his pistol from his left hip pocket to his right one and kept his hand on it. Smith's brother was with him at this time. Smith and his companions after going by Blunt and Scott stopped and talked awhile. Smith then came back towards the fire where Scott and Blunt were standing. As Smith approached close to Blunt, without saying anything, he drew his pistol and fired it rapidly at Blunt six times. As soon as he fired the first shot, Blunt fired back at him with his pistol, shooting three times. Several of the shots fired by Smith at Blunt took effect in his body. Blunt walked about 57 steps before he fell and died.

Another witness for the State corroborated in the main the testimony of Scott. He also stated that Smith fired at Blunt six times, and that Blunt fired at Smith three times; that he thinks Smith fired the first shot, but that they both fired right close together.

Bob Smith was a witness for himself. According to his testimony, he was not advancing on Blunt in the pool room for the purpose of fighting him when the latter drew his pistol and stopped him advancing toward him. The pool room was owned and operated by a brother of Smith. After the difficulty in the pool room his brother closed it for the night. The defendant, Smith, took his pistol which he had laid away for safe keeping earlier in the evening and placed it in his pocket. He then went on down the street and happened to go into the restaurant where Blunt and his companions

were eating. Smith told Blunt that if he had had his pistol at the time of the difficulty in the pool room that he would have shot Blunt. Smith and his companions then went on down to where the merry-go-round was being operated, and Smith did some repair work on it. He then started back to town to find a vehicle of some kind in which to go home. He lived several miles out in the country. In passing by the fire where Blunt and his companions were standing, Smith saw Blunt draw his pistol and fire it at him. Smith at once drew his own pistol and shot at Blunt six times in rapid succession.

Blunt died of the wounds received at the hands of Smith. Several other witnesses corroborated in the main the testimony of Smith. Some of the witnesses testified that both Smith and Blunt had taken several drinks of whiskey that night, and some of them said that the shots were fired so close together that they could not tell which one shot first.

The jury returned a verdict of manslaughter, and fixed the punishment of the defendant at four years in the penitentiary.

From the judgment of conviction Smith has duly prosecuted an appeal to this court.

*R. L. Montgomery, T. D. Crawford* and *D. K. Hawthorne,* for appellant.

The court erred in giving instructions for the State and in refusing those asked by the defense. 64 Ark. 144; 99 S. W. 383; 73 *Id.* 399; 133 Ark. 321-326. The giving of instructions 10 and 11 for the State and the refusal of Nos. 4 and 6 for defense were prejudicial. Cases *supra.*

*John D. Arbuckle,* Attorney General, and *Robert C. Knox,* Assistant, for appellee.

Under the evidence appellant was unquestionably guilty of manslaughter. 108 Ark. 125.

There are no errors in the instructions given and refused. 114 *Id.* 398; 73 *Id.* 399; 93 *Id.* 409-414; 62 *Id,*

307; 99 *Id.* 580; 23 *Id.* 730; 114 *Id.* 398; 120 *Id.* 193; 76 *Id.* 515; 103 *Id.* 352; 125 *Id.* 177; 128 *Id.* 35.

HART, J., (after stating the facts). It is first insisted that the court erred in giving instruction No. 10 to the jury upon the motion of the State. The instruction is as follows:

"In ordinary cases of one person killing another in self-defense it must appear to the defendant, acting without fault or carelessness on his part, that the danger was so urgent and pressing that in order to save his own life, or prevent his receiving great bodily harm or injury, the killing was necessary, and it must appear also that the person killed was the assailant or that the slayer had really and in good faith endeavored to decline any further contest before the mortal blow or injury was given."

It is claimed that neither this nor any other instruction given in the case told the jury that the defendant was not compelled to retreat if he was first assaulted by the deceased with a murderous intent. We can not agree with counsel in this contention. The theory of the State was that the parties were separated when they had their difficulty in the pool room, but that the defendant became very angry and approached the deceased in a restaurant on the same night telling him that he would kill him the next morning or as soon as he got anything to kill him with; that it was not the purpose of the deceased to again attack the defendant unless in his own necessary self-defense; that the defendant subsequently armed himself and passed by the deceased while he was standing by the fire at the merry-go-round; that the deceased shifted his pistol from his left to his right hand side and put his hand on it in order to be ready in case the defendant attacked him; that the defendant walked on by without attacking him, and that the deceased made no motion to shoot the defendant; that the defendant again approached the place where the deceased was standing and without warning suddenly pulled his pistol and fired six

times in succession at him; that the deceased did not shoot until after the defendant had fired one time. In short, it was the theory of the State that after the first difficulty the defendant armed himself and hunted up the deceased for the purpose of killing him, and was the aggressor throughout the difficulty.

On the other hand, it was the theory of the defendant that the deceased was the aggressor when the fatal rencounter occurred. According to the defendant's own testimony he had put his pistol in his pocket at the time his brother closed up the pool room and was going to take it to his home in the country. Before starting home he had done some repair work on the machinery of the merry-go-round and had no thought of shooting the deceased, but only intended to pass by the place where he was standing in order to find a vehicle in which to go home. As he approached the deceased the latter pulled his pistol and shot at him and he in turn then began firing at the deceased. The defendant's theory that the deceased was the aggressor was submitted to the jury in this, as well as the other instructions given by the court. This theory is contained in the clause in which the jury are told ''and it must appear also that the person killed was the assailant.'' The theory of the defense as well as that of the prosecution was fully and fairly submitted to the jury in this as well as the other instructions given by the court. Moreover the instruction is substantially in the language of an instruction numbered 7, which was approved in the case of *Plumley.* v. *State,* 116 Ark. 17.

It is next insisted that the court erred in giving instruction No. 9. The instruction is as follows:

''The killing being proved, the burden of proving circumstances of mitigation that justify or excuse the homicide shall devolve on the accused, unless by proof on the part of the prosecution it is sufficiently manifest that the defense only amounted to manslaughter or that the accused was justified or excused in committing the homicide.''

There was no error in giving this instruction. This
instruction is a copy of section 1765 of Kirby's Digest.
*Cogburn* v. *State,* 76 Ark. 110, and *Turner* v. *State,* 128
Ark. 565.

In the first mentioned case the court said that the
section of the statute just referred to is a rule of law
to be applied when the killing has been proved and there
is nothing shown to justify or excuse the act. The court
said further that in such a case it may well be presumed
that there was no justification, or the defendant would
have shown it. In the present case it was shown that the
defendant did the killing. In fact, he admitted having
done so. Other instructions were given by the court
which fully covered the subject of reasonable doubt.

It is next insisted that the court erred in refusing
to give instruction No. 6 asked by the defendant. The
instruction is as follows:

"You are instructed that under the law a person
does not have to wait until the party attacking has ac-
tually done him violence before he has a right to strike
in his own self-defense, but if the defendant as a rea-
sonably prudent person acting upon the facts and cir-
cumstances as they appeared to him, and from his stand-
point, actually believed that the deceased was attempting
to kill him or do him great bodily injury, then the defend-
ant had the right to defend himself, so if you believe
from the evidence in this case that the defendant acting
as a reasonably prudent person at the time he killed the
deceased, and upon the facts and circumstances as they
appeared to him and from his standpoint; believed that
the deceased was attempting to kill the defendant or do
him great bodily injury, then the defendant had the right
to stand his ground and defend himself and shoot the
deceased at the time."

The court did give at the request of defendant in-
structions numbered 5, 7 and 9. Instruction No. 5 is as
follows:

"You are instructed that if the defendant believed
that it was the intention of the deceased to kill him or

do him great bodily injury, and that the defendant without fault or carelessness on his part, shot the deceased, he was justified is so doing; that it was sufficient if the defendant, acting without fault or carelessness on his part, honestly believed that the killing was necessary, if he acted under such circumstances as made it reasonable to entertain that belief.''

Instruction No. 7 reads as follows:

''You are instructed that to justify a killing in self-defense, it is not essential that it should appear to the jury to have been necessary; but it is sufficient, if the defendant honestly believed, acting upon the facts and circumstances from his standpoint, and without fault or carelessness on his part, that the danger was so urgent and pressing that the killing was necessary to save his own life or to prevent him from receiving great bodily injury.''

Instruction No. 9 reads as follows:

''The jury are instructed that, in passing on the question as to whether the defendant was acting in his necessary self-defense, you are to consider his conditions and surroundings at the time, and determine whether the circumstances and surroundings were such as to induce in his mind an honest belief that he was in danger of losing his own life or of receiving great bodily injury at the hands of the deceased, and if you believe from the evidence that such was the case, and that the defendant at the time fired the fatal shot, while acting under such belief, and that he acted with due caution and circumspection and without negligence then it will be your duty to acquit the defendant.''

A comparison of these instructions which were given by the court at the request of the defendant with instruction No. 6 which was refused will show that the matters embraced in the refused instruction were fully covered in those given by the court at the request of the defendant. His theory of self-defense was fully covered in these and other instructions given by the court.

We find no prejudicial error in the record, and the judgment will be affirmed.