## Tatum v. State.

### Opinion delivered November 29, 1926.

1. HOMICIDE—MURDER—SPECIFIC INTENT TO KILL.—In a prosecution for murder a specific intent to take life is necessary to a conviction of murder, and in determining the existence of that intent the jury should consider the manner of the assault, the nature of the weapon used, the manner in which it was used, the statement of the defendant, and all the facts and circumstances tending to show his state of mind.

2. HOMICIDE—SPECIFIC INTENT.—The specific intent to kill, necessary in commission of murder, need not have existed for any appreciable length of time.

3. HOMICIDE—MALICE.—In a prosecution for murder, malice may be inferred from the fact that a murderous assault was committed with a knife, in connection with other circumstances.

4. HOMICIDE—ABUSIVE OR INSULTING WORDS.—Mere words, however abusive or insulting, cannot reduce a homicide from murder to manslaughter.

5. HOMICIDE—CONDITION OF MIND.—The only way to determine the condition of mind of another at the time of a killing by him is to judge from the attending circumstances.

6. HOMICIDE—MALICE QUESTION FOR JURY.—The question of the presence or absence of malice at the time of a killing is for the jury, when there is any evidence to support their finding.

7. CRIMINAL LAW—WEIGHT OF EVIDENCE.—The jury are the judges of the weight of the evidence.

8. CRIMINAL LAW—SUFFICIENCY OF EVIDENCE.—In reviewing a verdict the sufficiency of the evidence must be viewed in the light most favorable to the State.

9. CRIMINAL LAW—CREDIBILITY OF WITNESSES.—The jury are the judges of the credibility of witnesses, and may accept a part of a witness' testimony and reject a part believed to be false.

10. HOMICIDE—INSTRUCTION AS TO THREATS.—An instruction in a murder case not to consider threats if deceased was making no attempt to kill or do great bodily harm to defendant "as viewed from the standpoint of the defendant at the time acting without fault or carelessness on his part" *held* correct, in view of other instructions which submitted the question of the appearance of danger to the defendant.

Appeal from Lafayette Circuit Court; *James H. McCollum*, Judge; affirmed.

### STATEMENT OF FACTS.

Lee Tatum was indicted for murder in the first degree, charged to have been committed by stabbing A. Brittenberg with a knife.

It appears from the record that Lee Tatum and A. Brittenberg had a lawsuit about a tract of land, and came to Stamps, Lafayette County, Arkansas, for the purpose of taking depositions in the case. They met on the streets, and Tatum stabbed Brittenberg with a knife which resulted in his death in fifteen or twenty minutes. Thus far the facts are undisputed.

According to the testimony of C. W. Hamm, he saw Lee Tatum and Newt Aldridge sitting on an iron step about a foot high which extended out in front of a drugstore in the town of Stamps. The witness saw Brittenberg walking towards them. He then turned away, and his attention was attracted by hearing somebody scuffling. He looked around, and noticed Brittenberg advancing towards Tatum with his hands up (he was advancing towards Tatum as the latter came out from behind the offset made by the iron step extending out in front of the store). He saw the defendant make a stab at Brittenberg, and the latter threw up his hands and hol-

lowed "Oh!" He then put his hands to his side and leaned over. When he took his hands away from his side, the blood gushed to the sidewalk. Within fifteen or twenty minutes he died.

Two other witnesses testified to practically the same state of facts. They said that Brittenberg was pushing the defendant when the latter stabbed him. One of them said that the blood poured out of Brittenberg's body when he was stabbed.

Charlie McGill was also a witness for the State. According to his testimony, he saw the difficulty, and was not more than twenty feet from the scene of the difficulty when it occurred. He was asked to tell the jury what he saw, and answered as follows: "Well, I first noticed just a scuffle, and I didn't think it was much of a fight. They were just ruffling hands, and Brittenberg kindo' pushed Tatum back, and, as he did, why, Tatum took another step back, pushed against the drugstore door, and at the same time he was reaching for his right-hand back pocket for a knife, and just one step was made off that step of the drugstore, and, when he did, there was one strike, and Brittenberg tried to defend that."

On cross-examination he was asked if Brittenberg did not have his hands doubled up just before he tried to throw his hands up, and replied that he did not see them doubled up. He further stated that he did not see Brittenberg hit Tatum, but did see him push him. Brittenberg was seventy-three years of age at the time he was killed.

According to the testimony of Newt Aldridge, Brittenberg passed by the drugstore where the witness and the defendant were sitting, and shook hands with the witness. Brittenberg then turned to Tatum and said: "Mr. Tatum, I am not your friend. I won't shake hands with you." Mr. Tatum turned to Brittenberg and said: "I don't want no friendship from no such son-of-a-bitch as you are." Brittenberg then said: "I won't take that, Tatum, at all." Tatum began getting up, and Brittenberg hit him and knocked him up against the

screen door of the drugstore. Tatum caught on his hands as he was knocked against the door, and, when he got up, he took his knife out of his pocket. The witness told Brittenberg not to advance on Tatum, that he would cut him. Brittenberg made a step, and a short step, towards Tatum. He stooped a little bit and had his hands in the motion of boxing. Tatum then struck him with his knife. Brittenberg weighed somewhere between 175 and 200 pounds. He was a well-preserved man and skilled in boxing. The witness saw him knock out two boys with whom he was boxing.

The defendant was a witness for himself, and, according to his testimony, he stabbed the deceased with his knife in order to prevent him from doing him great bodily harm. Brittenberg had knocked him down one time and was advancing upon him in a threatening position when he stabbed him. The defendant admitted that he had sharpened his knife on the day before the killing, but said he did so because he had dulled it in cleaning some fish a few days before.

The jury returned a verdict of guilty of murder in the second degree, and fixed the punishment at ten years in the penitentiary. From the judgment and sentence of conviction the defendant has duly prosecuted an appeal to this court.

*Steve Carrigan* and *McKay & Smith,* for appellant.

*H. W. Applegate,* Attorney General, and *John L. Carter,* Assistant, for appellee.

HART, J., (after stating the facts). It is earnestly insisted by counsel for the defendant that the evidence is not legally sufficient to support the verdict. This court has held that, in a prosecution for assault with the intent to kill, it is necessary to show a specific intent to take life under such circumstances that, if death ensues, the accused would be guilty of murder in the first or second degree. It was also held that, in determining whether or not such intent existed, the jury should take into consideration the manner of assault, the nature of the weapon used, the manner in which it was used, the state-

ment of the defendant, and all facts and circumstances tending to show his state of mind. *Clardy* v. *State,* 96 Ark. 52, 131 S. W. 46, and *Davis* v. *State,* 115 Ark. 566, and cases cited.

While there must have been a specific intent to take life, it need not have existed for any appreciable length of time, and malice could have been inferred from the fact that a murderous assault was committed with a knife in connection with the other attendant circumstances. *Green* v. *State,* 51 Ark. 189; *Ferguson* v. *State,* 92 Ark. 145.

In *Keirsey* v. *State,* 131 Ark. 487, 199 S. W. 532, it was held that mere words, however abusive or insulting, cannot reduce the degree of homicide from murder to manslaughter.

In *Stepp* v. *State,* 170 Ark. 1061, 282 S. W. 684, the court said that, inasmuch as no one can look into the mind of another, the only way to decide upon its condition at the time of the killing is to judge from the attending circumstances, and that the question of the presence or absence of malice at the time of the killing is for the jury, when there is any evidence to support its finding, because the jury is the judge of the weight to be given to the evidence, in deciding its legal sufficiency to support a verdict, it must be viewed in he light most favorable to the State.

We have set out the substance of the evidence, and need not repeat it here. In arriving at its verdict, the jury was not required to accept or reject the whole of the testimony of any witness. The undisputed evidence shows that bad blood existed between the defendant and the deceased on account of a lawsuit between them about some land. They had come to Stamps, where the killing occurred, for the purpose of taking depositions in the case. The deceased passed a drugstore where the defendant and Newt Aldridge were sitting on an iron step in front of it. He shook hands with Aldridge, and refused to shake hands with the defendant, saying, in substance, that he was not his friend. The defendant

replied by applying a vile epithet to the deceased. It is
true that, according to the witnesses for the State, the
deceased first pushed the defendant back; but the jury
might have inferred that the defendant called the
deceased a vile name for the purpose of causing a row,
and had the intention of stabbing him with a knife and
killing him if the deceased tried to fight him with his
fist. He knew that the deceased had some skill in box-
ing, and that he was seventy-three years of age. While
the deceased was a large man, the defendant might have
thought that, on account of his advanced age, he might
not be able to harm him, but, on account of his skill in
boxing, he might claim that he cut deceased in order to
keep from receiving great bodily harm at his hands.
At least these were legal inferences which the jury might
have drawn from the testimony.

The jury was the judge of the credibility of the wit-
nesses, and might accept such portion of the testimony
of any particular witness which it believed to be true
and reject that part which it believed to be false. When
the testimony is viewed in the light most favorable to
the State, the jury might have inferred that Tatum was
angered at the deceased and intended to raise a quarrel
with him and to stab him and kill him if he should
advance upon him. In reaching this conclusion, the jury
might take into consideration the character of the wound,
the fact that it caused death in fifteen or twenty minutes,
and the further fact that the defendant sharpened his
knife on the day before, at a time when he knew that
he would meet the deceased in Stamps, where they were
to take depositions in a pending lawsuit. It is true that
the deceased first addressed the defendant by saying that
he would not shake hands with him because he was not
his friend. In the first place, there was nothing in the
language used which was insulting; but, even if it should
be so construed, as we have already seen, words, how-
ever insulting, are not sufficient to reduce a homicide
from murder to manslaughter. It follows that we are

of the opinion that the evidence is legally sufficient to warrant the verdict.

It is next insisted that the court erred in giving instruction No. 15, at the request of the State. The instruction reads as follows: "You are instructed that the only purpose for which proof of threats is admissible is to throw light on the state of mind of the defendant at the time he struck the fatal blow, and to show who was the probable aggressor, and if you believe, from the evidence as explained in these instructions, that the deceased was not making any attempt to kill the defendant or do him great bodily harm, as viewed from the standpoint of the defendant, acting as a reasonable man, you will not consider threats, even if proved, for any purpose; and in this connection you are told that threats alone, however violent, would not justify an assault or afford provocation for a homicide."

Counsel for the defendant specifically objected to that part of the instruction which makes the defendant view the facts as a reasonable man and because of reading "as viewed from the standpoint of the defendant acting as a reasonable man," instead of "as viewed from the standpoint of the defendant at the time, acting without fault or carelessness on his part." We do not think the objection of counsel to the instruction is well taken. There is nothing in the testimony itself to show that the defendant was not a reasonable man or a man of ordinary intelligence. The question was narrowed down to whether, under the circumstances of the case, the attitude of the deceased, as described by the witnesses, was of itself sufficient to create in the mind of the defendant, as a reasonable man or a man of ordinary intelligence, a *bona fide* belief that the danger to him was imminent, and that the action which he took was necessary for the purpose of protecting himself from loss of life or the infliction of great bodily injury. If a man of ordinary intelligence, or a reasonable man under the same circumstances, would not have believed the danger to have been real, then the defendant cannot be said to have been justified

in his action. In several other instructions given to the jury the court submitted the appearance of danger to the defendant, in accordance with the rules of law laid down in our previous decisions. When the instructions are considered and read as a whole, we cannot see how the jury could have been misled by the instruction in question or could have thought that it referred to any other time than the time of the killing. *Branscum* v. *State,* 134 Ark. 66, 203 S. W. 12, and *Sullivan* v. *State,* 17 Ark. 768.

It is next insisted that the court erred in refusing to give instruction No. 12, requested by the defendant, which reads as follows: "You are instructed that, if you believe from the evidence that the deceased had made threats of physical violence against the defendant, and that these threats had been previously communicated to the defendant, and that the deceased came up to where the defendant was sitting in the door of the store at Stamps, and struck the defendant, and that the acts and conduct of the deceased at the time were such as to lead the defendant to believe that the deceased was about to put his threats into execution, and that it honestly appeared to the defendant, acting on the facts and circumstances as they appeared to him from his standpoint at the time, without fault or carelessness on his part, that it was necessary to stab and kill the deceased to prevent him from taking his life or doing him serious bodily injury, then you are instructed that the defendant would be justified in so acting, and you should return a verdict of not guilty for the defendant."

The evidence on the part of the defendant showed that the deceased had made previous threats against the defendant and that the persons to whom the threats had been made communicated them to the defendant. The court, in other instructions, however, instructed the jury that it might consider such threats in determining who was the aggressor at the time the killing occurred. The court was not required to multiply instructions upon the same phase of the case. The respective theories of

the State and of the defendant were fully and fairly submitted to the jury in the instructions given by the court. We have examined these instructions carefully, and find no reversible error in them.

It follows that the judgment must be affirmed.