RHINE v. STATE.

Opinion delivered September 28, 1931.

*C. C. Elrod* and *Williams & Williams,* for appellant.

*Hal L. Norwood,* Attorney General, and *Pat Mehaffy,* Assistant, for appellee.

HART, C. J. Lee Rhine prosecutes this appeal to reverse a judgment of conviction against him for manslaughter upon the verdict of the jury fixing his punishment at three years in the State penitentiary.

Henry Walker, sheriff of Washington County, Arkansas, was the first witness for the State. According to his testimony, on the 24th day of December, 1930, he was informed that Bill Brundidge had been killed in a wood pasture on the farm of Adam Rhine in Washington County, Arkansas. He first went to the house of Adam Rhine, and two of Rhine's little boys went with him to the wood pasture to show him where the body of Brundidge lay. When he arrived there, he found the body of Brundidge with his back to the ground and a shotgun on his chest with the barrel pointing upwards. There was a considerable amount of blood around the shoulders. Brundidge's throat had been cut right around from behind one ear under the jaw bone and back to the other ear. It was a deep cut, and just a little bit of the neck in the back was left. Brundidge's head was slightly uphill and his feet downhill. There was not much blood on the ground, the most part of the blood being on his shoulders. The gun was a twelve-gauge pump-gun and had four or five shells in the magazine. Bill Brundidge was a heavy-set, muscular sort of man and rather tall. The defendant, Lee Rhine, was also a very strong man. Several other cuts were on the arm and head of the deceased. The testimony of the sheriff was corroborated by that of Frank Fletcher, a deputy sheriff. The latter described the wound as a deep cut clear to the bone, and said that, as a matter of fact, Brundidge's head was almost cut off from his body. He stated further that Lee Rhine told them that he had cut Bill Brundidge's throat.

Ben Anglin, who assisted in preparing the body of Brundidge for burial, said that they found his throat cut from his left ear right around under his chin to be-

hind his right ear. There were seven cuts on his head and one in the back of his neck and one bad cut on the left shoulder. Another witness who assisted in preparing the body for burial testified that there was a cut on one shoulder and seven stabs or cuts on the head. One of these witnesses said that his throat was cut from ear to ear to his spinal column.

Charley Brundidge testified that he was a brother of Bill Brundidge and that Bill Brundidge's throat was cut from ear to ear clear to the neck bone. The blood appeared to have run from his neck to his shoulders. Bill Brundidge at the time he was killed was thirty years old and weighed 185 pounds. Other witnesses described the defendant as being as large and stout as the deceased, and some of them said he was the stronger and more active man of the two.

The knife with which the deceased was killed was exhibited to the jury, and it was fairly inferable from the evidence that the point of one blade had been broken off while the defendant was stabbing the deceased. One of the witnesses said that the blade appeared to have been broken recently.

According to the testimony of Adam Rhine, on the morning of the killing, he had sent his two little sons to drive up some of his horses from a wood pasture. He became uneasy because they did not come home as soon as he expected them, and he requested his son, Lee Rhine, to go after them, which he did.

According to the testimony of Andrew Rhine, he was ten years of age when he and his brother were sent to the wood pasture south of the house to look for the horses. They met Bill Brundidge in the pasture. He had a shotgun and told them to sit down. They did so, and he then said that if the boys were not so little he would shoot their brains out. While they were sitting there, he abused them and told them that he didn't intend for any more of his liquor to be stolen by the Rhine family. About that time, the defendant, Lee Rhine, walked towards them from behind Brundidge. Brun-

didge pulled back the trigger of his gun and started to shoot. Lee ran around behind a small tree, and the witness ran towards home and did not see any more.

According to the testimony of Charley Rhine, he was thirteen years of age, and, when he and his younger brother found the horses, they started to drive them home. After they had driven the horses twelve or fifteen steps, they met Bill Brundidge who told them to sit down. They did so, and Brundidge told them that, if they were not so little, he would shoot their brains out. He had a twelve-gauge pump shotgun. Brundidge said that he didn't want any more of his whiskey stolen, and that he was going down and kill the rest of the Rhine family. The witness told Brundidge that he had not stolen any of his whiskey. Witness first saw his brother Lee coming towards them about fifteen steps away. He came up behind Brundidge. When Brundidge saw Lee coming he picked up his gun and said: "There is another Rhine I am going to get." Lee then jumped behind a small tree. Brundidge then started towards him and knocked Lee down striking him with the barrel of his gun. Brundidge knocked Lee down and jumped on him. Lee got his knife out, got it open, and commenced cutting Bill Brundidge, who finally fell over on his back. Witness could see his brother Lee striking Brundidge on the head with his knife. Lee was down on his knees at the time. Lee grabbed the gun barrel in his left hand. The gun was cocked, and Brundidge was trying to get it away from Lee Rhine so that he could shoot him. He said that Brundidge was a little bigger than Lee Rhine, but that Lee was the better man of the two, meaning that he was of more physical strength and activity. As soon as he killed Brundidge, Lee went home and told his father about it, and his father directed another one of his brothers to go and notify the sheriff. Brundidge had his left hand on the barrel of his gun, and his right hand on the trigger when his body was found.

Two physicians testified that Lee Rhine suffered with epilepsy, and that, when he had an attack of it, he had no

knowledge of what was going on around him but was wholly unconscious.

According to the testimony of Lee Rhine, he went up to the pasture to find his little brothers at the request of his father. He saw his little brothers sitting down on the ground, and Bill Brundidge was about eight feet away from them and "sassing" the little boys. When Lee walked up, Brundidge said, "There comes another damn Rhine, and I'm going to kill him, and when I get through with him, I am going back down there and finish." Brundidge then started towards Lee Rhine with his shotgun in his hand. Lee Rhine jumped behind a small tree, and Brundidge came towards him and knocked him down with his shotgun. Lee Rhine got up on his knees, and Brundidge continued to strike him. Lee grabbed the gun with his left hand and with the other reached into his pocket and pulled out his knife and opened it. Brundidge had his gun cocked. Lee Rhine finally cut Brundidge's throat after they had been fighting for sometime. Brundidge then fell on Lee Rhine's breast, and he pushed him off, and Brundidge rolled down on the ground on his back.

Other evidence was introduced for the State and for the defendant, but we do not deem it necessary to set it out, because what we have stated substantially describes the situation of the parties and the circumstances attending the killing.

The law presumes malice from the intentional use of a deadly weapon in the commission of homicide unless the existence of malice is rebutted or overcome by the evidence which proves the killing. *Palmore* v. *State,* 29 Ark. 248; *Sullivan* v. *State,* 163 Ark. 353, 258 S. W. 980, and *Tatum* v. *State,* 172 Ark. 244, 288 S. W. 904. This proposition is well settled by a long and uniform line of decisions in this State, and no further citation of authority is necessary.

Every person is presumed to intend the natural and probable consequences of his act. Hence, his intention to kill may be inferred from the act of killing another person with a deadly weapon or a weapon calculated to

inflict great bodily harm upon another person; but this is an inference of fact to be drawn by the jury and not a presumption of law to be applied by the court.

In the present case, the jury found the defendant guilty of manslaughter, thereby negativing the idea that the defendant was actuated by malice in the killing, but rather that he had acted too hastily without any considerable provocation. *Freeman* v. *State*, 174 Ark. 1035, 298 S. W. 333.

Under § 2342 of Crawford & Moses' Digest, where the killing is proved, the burden of proving circumstances of mitigation that justify or excuse the homicide devolves upon the accused unless the evidence which proved the killing shows that the offense committed only amounted to manslaughter or that the accused was justified or excused in committing the homicide. *Cogburn* v. *State*, 76 Ark. 110, 88 S. W. 822; *Smith* v. *State*, 139 Ark. 356, 213 S. W. 403, and *Graves* v. *State*, 155 Ark. 30, 243 S. W. 855. This proposition is also well settled by the uniform current of authority in this State.

It is earnestly insisted by counsel for the defendant that the evidence introduced overcomes the case made by the State and that the undisputed evidence shows that the defendant acted in his own self-defense in killing the deceased. In making this contention, they rely upon the fact that the defendant and his two little brothers were the only eye-witnesses to the killing, and that their testimony, being consistent, conclusively shows that the defendant was justified or excused in killing the deceased. We cannot agree with the argument that the evidence for the defendant is undisputed and conclusively overcomes the case made by the State. The evidence for the State shows that the defendant killed the deceased. One of the officers testified that the defendant admitted the killing to him. Defendant also admitted the killing when he took the stand as a witness in his own behalf. The manner of the killing as described by himself and his two little brothers on the witness stand was in all respects similar, but we do not think that it can be said to be undis-

puted because it is not consistent with the evidence for the State. The evidence for the State shows that the deceased was found lying on his back with his gun cocked and his right hand on the trigger. He was a strong, able-bodied man, and the marks on his face and shoulder showed that he was stabbed seven times. His throat was cut from ear to ear, and his head was nearly severed from his body. This wound produced instant death, and thus the jury might have inferred that he had been stabbed at least six times before his throat was cut. The jury might have further found that, if his hand had been on the trigger and he was trying to shoot the defendant, there was nothing to prevent him from pulling the trigger while the defendant was stabbing him on the face and shoulders with his knife. The jury might have found that bad blood existed between the defendant and the deceased, and that they began fighting, Brundidge striking the defendant Rhine with his gun and the defendant striking back with his knife. The jury might have believed that the attendant circumstances negatived the idea that the defendant killed the deceased in his own self-defense. The jury were the judges of the credibility of the witnesses and the weight to be given to their testimony. The facts and circumstances warranted the jury in drawing the inference that the killing did not occur in the manner described to it by the defendant and his little brothers. The jury was not required to accept as true the testimony of any witness. They might believe one part of it and reject another part. In the exercise of the duty conferred upon the jury as the trier of the facts under our Constitution, there were facts and circumstances warranting the jury in finding the defendant guilty of manslaughter. *Houston* v. *State,* 165 Ark. 294, 264 S. W. 869; *Stepp* v. *State,* 170 Ark. 1061, 282 S. W. 684; *Ferguson* v. *State,* 92 Ark. 120, 122 S. W. 236; *Vaden* v. *State,* 174 Ark. 950, 298 S. W. 323; and *Freeman* v. *State,* 174 Ark. 1036, 298 S. W. 333.

The record shows that the court submitted the cause to the jury under approved instructions upon the law of homicide and that no improper evidence was admitted

before the jury. We find no reversible error in the record, and the judgment will be affirmed.

HUMPHREYS and KIRBY, JJ., dissent.